UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRIS KEBLER, Individually and on Behalf of All Others Similarly Situated, ) ) | No. |
| ) | |
| Plaintiff, ) | <u>CLASS ACTION</u> |
| ) | |
| vs. ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| ) | |
| ACACIA COMMUNICATIONS, INC., MURUGESAN SHANMUGARAJ and JOHN F. GAVIN, ) ) ) | |
| ) | |
| Defendants. ) ) | |
| ) | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Chris Kebler ("plaintiff") alleges the following based upon the investigation of counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Acacia Communications, Inc. ("Acacia" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, and press releases and other public statements issued by and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who purchased the publicly traded securities of Acacia between August 11, 2016 and July 13, 2017, inclusive (the "Class Period"). The claims are brought under the Securities Exchange Act of 1934 ("1934 Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5]. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

3.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Acacia is headquartered in this District and because many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

5.    Plaintiff Chris Kebler acquired Acacia securities as set forth in the accompanying certification, which is incorporated herein by reference, and has been damaged thereby.

6.    Defendant Acacia designs, develops, manufactures and markets high-speed coherent optical interconnect products for cloud infrastructure operators and content and communication service providers.  Acacia is headquartered at Three Mill and Main Place, Suite 400, Maynard, Massachusetts.  Acacia common stock traded in an efficient market on the New York Stock Exchange throughout the Class Period under the ticker symbol "ACIA."  As of July 28, 2017, Acacia had more than 39.2 million shares issued and outstanding.

7.    Defendant Murugesan Shanmugaraj ("Shanmugaraj") is, and was at all relevant times, Acacia's President, Chief Executive Officer ("CEO") and a member of its Board of Directors.

8.    Defendant John F. Gavin ("Gavin") is, and was at all relevant times, Acacia's Chief Financial Officer ("CFO").

9.    Defendants Shanmugaraj and Gavin are referred to herein as the "Individual Defendants." Acacia and the Individual Defendants are referred to herein, collectively, as "Defendants."

10.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Acacia.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Acacia securities was a success, as it: (i) deceived the investing public regarding Acacia's prospects and business; (ii) artificially inflated the prices of Acacia securities; (iii) allowed Acacia and certain of its senior executives, insiders and venture-capital financiers to cash out, selling more than $450 million worth of Acacia common stock in a registered public stock offering; (iv) allowed certain of Acacia executives and insiders to cash out, selling more than $188.2 million worth of their personally held shares of Acacia common stock at

artificially inflated prices during the Class Period (including shares sold in the registered public stock offering); and (v) caused plaintiff and other members of the Class to purchase Acacia securities at artificially inflated prices.

## BACKGROUND

11.    Defendant Acacia develops, manufactures and sells high-speed coherent optical interconnect products in the Americas, Europe, the Middle East, Africa and the Asia Pacific region. The Company's product offerings include a series of low-power coherent digital signal processor application-specific integrated circuits, or DSP ASICs, and silicon photonic integrated circuits, or silicon PICs, which it has integrated into families of optical interconnect modules with transmission speeds ranging from 40 to 400 gigabits per second, or Gbps, for use in the long-haul, metro and inter-data center markets.  Acacia derives substantially all of its revenue from the sale of its products within its 100 and 400 Gbps product families.

12.    Acacia sells the substantial majority of its products to network equipment manufacturers for ultimate sale to communications and content service providers and data center and cloud infrastructure operators, which it refers to together as cloud and service providers.  Acacia expects network equipment manufacturer customers to be the primary market for its products for the foreseeable future.

13.    Acacia's negotiated terms and conditions of sale do not allow for product returns, meaning its customers take a long time to decide what products to purchase because they cannot return any of the product.  According to Acacia, "[c]ustomer orders are complex and difficult to complete because prospective customers generally consider a number of factors over an extended period of time before committing to purchase the products [Acacia] sell[s]," and those "[c]ustomers often view the purchase of [Acacia's] products as a significant and strategic decision and require considerable time to evaluate, test and qualify [the] products prior to making a purchase decision and

placing an order." According to Acacia, its "product revenue is typically characterized by a life cycle that begins with sales of pre-production samples and prototypes followed by the sale of early production models with higher average selling prices and lower volumes, followed by broader market adoption, higher volumes, and average selling prices that are lower than initial levels." In addition, Acacia says that its "product revenue may be affected by contractual commitments to significant customers that obligate [the Company] to reduce the selling price of [its] products on an annual or semi-annual basis."

14.     Acacia's products are supposed to be fully functional at the time of shipment and do not require production, modification or customization. According to the Company, it recognizes revenue from product sales only after persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable and collection is reasonably assured. Indeed, according to Acacia, its "fee is considered fixed or determinable at the execution of an agreement, based on specific products and quantities to be delivered at specified prices, which is evidenced by a customer purchase order or other persuasive evidence of an arrangement."

15.     While these factors can make the Company's sales cycle long, they also afford Acacia significant foresight into customer demand and its upcoming sales to customers.

16.     On May 18, 2016, Acacia completed its initial public offering ("IPO"), issuing and selling 4,570,184 shares of common stock to the public at $23 per share, with certain selling stockholders selling an additional 604,816 shares in the offering. The Company received more than $105 million in gross proceeds from the IPO. The "Selling Stockholders" included defendant Shanmugaraj, who sold 50,000 shares, receiving $1.15 million in gross proceeds; defendant Gavin, who sold 7,500 shares, receiving $172,500 in gross proceeds; and 10 other Acacia executives who

collectively sold another 413,816 shares of their personally held Acacia common stock for more than $9.5 million in gross proceeds.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

17.    The Class Period starts on August 11, 2016.  On that day, Acacia issued a press release announcing its second quarter 2016 ("2Q16") financial results, for the period ended June 30, 2016, and provided third quarter 2016 ("3Q16") guidance well above what the market had been led to expect.  According to the press release, Acacia had achieved "Revenue of $116.2 million up 101% and Net Income up 274% year-over-year."  Defendants Shanmugaraj and Gavin commented on the results, stating in pertinent part as follows:

> "Our record second quarter results exceeded our expectations across the board and reflect the success of our disruptive technology in transforming cloud, content and communications networks. These results are a testament to our strategy and demonstrate our leadership position in the high-growth 100G plus optical networking market," said Raj Shanmugaraj, President and CEO of Acacia Communications, "We continue to see strong global demand for our products, driven by metro and inter-data center network infrastructure buildouts."

> "We are delighted to have completed our IPO during the second quarter and are excited about the many opportunities ahead of us," said John Gavin, CFO of Acacia Communications, "The IPO enabled us to strengthen Acacia Communications' balance sheet while providing substantial capacity to further grow the business."

18.    The release also provided the following 3Q16 guidance:

| Quarter Ending September 30, 2016 | | | |
|---|---|---|---|
| Revenue (millions) | $120.0 | to | $128.0 |
| Non-GAAP Net Income (millions) | $ 26.0 | to | $ 31.0 |
| Non-GAAP Diluted Earnings Per Share | $ 0.64 | to | $ 0.76 |

19.    Later that afternoon, Acacia conducted a conference call with analysts and investors and provided further positive commentary about the Company's business metrics and financial prospects.

20. Following the issuance of the press release and the conference call, the price of Acacia common stock spiraled upward, increasing more than 40% on August 12, 2016 to as high as $98.75 per share in intraday trading before closing at $95.67 per share, on unusually high trading volume of more than 5.1 million shares, or more than seven times the average daily trading volume over the preceding ten trading days.

21. Analysts reacted positively to the Company's statements and upbeat guidance. For instance, on August 12, 2016, analysts at Deutsche Bank issued a report entitled "Solid Beat and Raise Results," which stated in pertinent part as follows:

**Beat and Raise Story; Reiterate Buy; Raise PT: $60 to $90**

Solid Q2 beat and raise: $116.2M/77c versus consensus: $85.8M (consensus EPS numbers are not comparable), and the Q3 guide: $120-128M/64-76c versus consensus: $91.7M. ***The top-line beat was driven by strong global demand for [Acacia's] 100G and 400G Optical modules in Metro and Cloud Datacenter Interconnects***. We are bullish on [Acacia's] "disruptive" Optical Networking Growth Story - a +$4-5B Silicon Optical opportunity [DB view]. Our midterm view calls for +30% topline CAGR, high 40s gross margin, low 20s operating margin. We raise our PT from $60 to $90. Reiterate BUY.

22. Likewise, on August 12, 2016, stock analysts at Cowen and Company issued a report entitled "2Q16: Comes Out of the Gate Firing On All Cylinders," which stated in pertinent part as follows:

2Q16 operating results bolster our investment outlook: [Acacia] represents an exceptional company addressing a significant 100G+ optical upgrade cycle (***fueled by Metro, DCI and China***), ***which should continue to drive impressive growth and operating profitability***. We are significantly raising our operating forecasts and price target and reiterate our Outperform rating.

**Significantly Increasing Estimates Off of Significant Beat and Raise**

We have significantly increased our operating forecasts and price target in the wake of [Acacia's] 2Q16 extraordinary results and outlook. We have increased our CY16, 17 and 18 revenue forecasts by over $100M in each year and PF EPS estimates by $1.14, $0.83 and $0.32, respectively. 2Q16 $116.1M revenue and $0.77 EPS was ~ $30 mln (or 35+%) and over $0.46 (or ~ 150%) above our $86.3M/$0.31 and Street consensus's $85.8M/$0.30 estimates. The significantly higher revenue

(35+%) together with significantly higher GM (~4 pp) drove the 150% EPS upside relative to our and consensus's estimates.  In addition, [Acacia] posted opex over $2M below consensus's estimate.  Similarly, [Acacia's] $120 – 128M 3Q16 rev and $0.64 – 0.76 PF EPS guidance each significantly exceeded our $91.6M/$0.43 and consensus's $90.7M/$0.42 previous estimates – at the midpoint by over $32 mln (or 35%) and $0.27 (or ~ 65%), respectively.  Alternatively viewed: reported 2Q16 EPS exceeded our EPS forecast for 2Q16 + 3Q16.  ***Strong growth in backlog, lead times of 9 - 10 weeks on the low end to as much as 13 – 15 weeks on the higher end, and some degree of supply constraint provides good visibility***.

23.    On September 26, 2016, Acacia filed a Form S-1 registration statement with the SEC, which stated that the Company intended to issue and sell up to $125 million worth of its common stock and that certain selling stockholders would sell up to an additional $325 million worth of their personally held shares.

24.    On September 26, 2016, Acacia filed a Form 8-K with the SEC providing its "Financial Outlook for the Third Quarter of 2016."  In the Form 8-K, Acacia raised its 3Q16 revenue guidance, stating in pertinent part as follows:

> Based on preliminary unaudited information and estimates of the management of Acacia Communications, Inc. (the "Company") for the three months ending September 30, 2016, and subject to the completion of the 2016 third quarter and its financial closing procedures, in the three months ending September 30, 2016, ***the Company expects revenue of $127 million to $131 million***, GAAP net income of $23 million to $27 million, non-GAAP net income of $29 million to $33 million, GAAP diluted earnings per share of $0.58 to $0.67 and non-GAAP diluted earnings per share of $0.72 to $0.81.

25.    On October 4, 2016, Acacia amended its Form S-1 registration statement, which was declared effective on October 6, 2016 by the SEC.  On or about October 7, 2016, Acacia priced the secondary public stock offering ("SPO") at ***$100 per share*** and filed its final prospectus, which formed part of the registration statement (collectively, the "SPO Registration Statement"), with the SEC.  In the SPO, Acacia issued and sold 1,210,302 shares of stock, receiving more than $121 million in gross proceeds, and the selling stockholders sold another 3,289,698 of their personally held shares, receiving approximately $328.9 million in gross proceeds.  The "Selling Stockholders"

in the SPO included defendant Shanmugaraj, who sold 108,163 shares for more than $10.8 million in gross proceeds; defendant Gavin, who sold 25,501 shares for $2.5 million in gross proceeds; and several other Acacia officers and directors, who sold another 1,823,729 shares for more than $182.3 million in gross proceeds.

26.     Concerning the quality of Acacia's products, the SPO Registration Statement stated in pertinent part that, "[t]hrough the use of standard interfaces, [Acacia's] modules can be easily integrated with customers' network equipment" and that the "advanced software in [its] modules enables increased configurability and automation, provides insight into network and connection point characteristics and helps identify network performance problems, all of which increase flexibility and reduce operating costs."

27.     Specifically addressing the design and manufacturing of Acacia's products, the SPO Registration Statement stated in pertinent part as follows:

> Our modules are rooted in our low-power coherent DSP ASICs and/or silicon PICs, which we have specifically developed for our target markets. ***Our coherent DSP ASICs are manufactured using complementary metal oxide semiconductor, or CMOS, and our silicon PICs are manufactured using a CMOS-compatible process.*** CMOS is a widely-used and cost-effective semiconductor process technology. Using CMOS to siliconize optical interconnect technology enables us to ***continue to integrate increasing functionality into our products, benefit from higher yields and reliability associated with CMOS and capitalize on regular improvements in CMOS performance, density and cost.*** Our use of CMOS also enables us to use outsourced foundry services rather than requiring custom fabrication to manufacture our products. In addition, our use of CMOS and CMOS compatible processes enables us to ***take advantage of the major investments in manufacturing and the technology and integration improvements*** driven by other computer and communications markets that rely on CMOS.
>
> Our engineering and management teams have extensive experience in optical systems and networking, digital signal processing, large-scale ASIC design and verification, silicon photonic integration, system software development, hardware design and high-speed electronics design. This broad expertise in a range of advanced technologies, methodologies and processes ***enhances our innovation, design and development capabilities*** and has enabled us to develop and introduce ten optical interconnect modules, five coherent DSP ASICs and three silicon PICs since 2009. . . . ***In the course of our product development cycles, we continuously***

*engage with our customers as they design their current and next-generation network equipment, which provides us with insights into current and future market needs.*

28.     The SPO Registration Statement represented that one of Acacia's "Competitive Strengths" was its "[t]rack record of rapid innovation driven by *advanced design methodologies*," stating that Acacia's "development capabilities and *advanced design methodologies* ha[d] enabled [it] to introduce ten optical interconnect modules, five coherent DSP ASICs and three silicon PICs since 2009."

29.     The SPO Registration Statement emphasized the purported ongoing strong demand for Acacia's products, stating in pertinent part that Acacia had "experienced rapid revenue growth over the last several years," noting that its "revenue for 2015 was $239.1 million, *a 63.5% increase* from $146.2 million of revenue in 2014," and that its "revenue for the six months ended June 30, 2016 was $200.7 million, *a 91.0% increase* from $105.1 million of revenue in the six months ended June 30, 2015."   For the quarter ended September 30, 2016, the SPO Registration Statement highlighted that Acacia expected "revenue of $130 million to $133 million," *an increase of more than 100%* over the $65.4 million reported in the third quarter of 2015.

30.     The SPO Registration Statement stated that Acacia's "revenue ha[d] generally increased . . . due to *increased demand for products* in [its] 100 Gbps product family, as well as the introduction of new products in [its] 400 Gbps product family."   Once again highlighting the deep understanding Acacia had of its ongoing sales trends, the SPO Registration Statement listed as another of Acacia's "Competitive Strengths" its "[c]ustomer collaboration[, which] provide[d] *deep understanding of market needs*," emphasizing that Acacia "collaborate[s] closely with [its] customers, as well as directly with many cloud and service providers, which allows [it] to better understand their needs *and anticipate next generation product and service requirements*."

31.     The SPO Registration Statement stated that as Acacia "continue[d] to enhance and expand [its] product families, and as [its] existing customers [sought] to expand and improve their network equipment technology, [Acacia] expect[ed] to generate additional revenue through sales to these customers."

32.     Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  Under the rules and regulations governing the preparation of the SPO Registration Statement, Acacia was required to disclose at the time of the SPO that sales to its top two customers were declining due to operational issues specific to those companies and that there were quality issues with the manufacture of the product offerings of Acacia's largest customer, Hong-Kong based ZTE, which the Company would be responsible for remediating.  The Registration Statement, however, contained no such disclosures.  These adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Acacia's profitability, and, therefore, were required to be disclosed in the SPO Registration Statement but they were not.

33.     On October 27, 2016, Acacia's largest client, ZTE, which had provided approximately 38% of Acacia's sales during the first half of 2016, reported dismal 3Q16 sales and even worse FY16 sales guidance.  ZTE's 3Q16 ended on September 30, 2016, well before Acacia's SPO.  ZTE issued weak forward sales guidance as demand for ZTE's 4G telecom infrastructure was slowing in China as major carriers completed their network coverage.  That same day, Germany's ADVA, Acacia's second largest customer, historically responsible for 24% of its sales, also issued

soft FY16 earnings guidance, stating that it had fallen approximately three months behind in rolling out its CloudConnect technology, which used Acacia's 400 gigabit coherent module.

34.    On this news, the price of Acacia common stock declined approximately 14% on October 27, 2016, closing at $73.66 per share, on unusually high volume of more than 8.5 million shares traded, or more than four times the average daily trading volume over the preceding ten trading days.

35.    On November 10, 2016, Acacia reported its 3Q16 financial results.  The Company reported that it had achieved "Revenue of $135.3 million up 107% and Net Income up 295% year-over-year."  Defendants Shanmugaraj and Gavin commented on the results,  stating in pertinent part as follows:

> "Our third quarter results exceeded our expectations driven by strong global demand for our products across metro and inter-data center networks," said Raj Shanmugaraj, President and CEO of Acacia Communications.  "To satisfy this continued demand, we further scaled our manufacturing capacity during the quarter. As was the case in the second quarter, we continued to diversify our revenue base, with two of our newer top tier customers ranking among the top five contributors to our revenue in the third quarter.  Additionally, we recently announced sampling of our coherent CFP2-DCO module, leveraging our sixth DSP ASIC developed in 16nm CMOS, which we believe demonstrates our continued technology leadership position."

> "We are pleased that the continued market success of our highly-integrated product portfolio, combined with our ability to increase production capacity, led to enhanced profitability during the third quarter," said John Gavin, CFO of Acacia Communications.  "We are also pleased to have completed our follow-on offering last month, which strengthened our balance sheet and provides us with financial flexibility to pursue our growth objectives and expand our product offerings."

36.    The November 10, 2016 release also provided the following fourth quarter 2016 ("4Q16") financial guidance:

| Quarter Ending December 31, 2016 | | | |
|---|---|---|---|
| Revenue (millions) | $136.0 | to | $141.0 |
| Non-GAAP Net Income (millions) | $36.0 | to | $39.0 |
| Non-GAAP Diluted EPS | $0.85 | to | $0.92 |

37.     Then, when Acacia reported its own 4Q16 and FY16 financial results after the close of trading on February 23, 2017, it issued FY17 revenue guidance and an earnings forecast well below what Acacia had led the investment community to expect.  As a prime cause for the disappointing guidance, Acacia cited weak orders from one big unnamed customer, identified by several stock analysts as ADVA.  As lamented by stock blogger *The Motley Fool*, Acacia was still highly dependent upon a few customers and its "days of extremely rapid growth" provided by those customers "appear[ed] over for now," noting that the market "didn't take the news well, sending the stock plunging."

38.     In order to prevent a free-fall in the stock price, the release included the following positive statements by the Individual Defendants about the Company's business metrics and financial prospects:

>  "***Our solid fourth quarter results were driven by continued strong global demand for our 100G and flex-400G products from the metro and DCI markets and the ramp of our newer customers, and we are very pleased to report that we added a hyper-scale cloud and content provider, who is a direct customer deploying our AC400 product, as a significant customer in the fourth quarter***," said Raj Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "We are committed to our mission of delivering high-speed optical interconnects that transform cloud, content and communication networks.  ***We are already seeing good traction with our latest "industry first" product, the CFP2-DCO module, and we believe that our current product offerings, roadmap products, and development pipeline, position us well to take advantage of future growth opportunities***."
>
>  "Our fourth quarter results again exceeded our guidance for revenue and non-GAAP diluted EPS ***and capped off a strong year at Acacia Communications***. During the fourth quarter, we experienced year-over-year revenue growth of 108%, further diversified our revenue base, with sales to newer customers outside our original eight 2011 customers increasing to 35% of our total revenue from 14% in the first quarter of 2016," said John Gavin, Chief Financial Officer of Acacia Communications.  "***We believe our market strategy and business model are strong, and position us for further growth***."

(Footnote omitted.)

39.     On this news, the price of Acacia common stock declined more than 14% on February 24, 2017, closing at $54.04 per share, on unusually high volume of more than 5.1 million shares traded, or more than twice times the average daily trading volume over the preceding ten trading days.

40.     On April 25, 2017, Acacia's competitor MACOM Technology Solutions Holdings, Inc. ("Macom") reported its financial results for the quarter ended March 31, 2017, including dour financial guidance for the following quarter, citing a near-term demand slowdown in China and inventory correction issues.  On its conference call the same day, Macom's CEO was "emphatic" that "there [was] no question that there [was] a cyclical weakness on the carrier base side of the business," stating "you've got the China correction happening with the Metro/Long Haul provincial deployments, so there's no question that there is some headwinds [sic] in demand," adding "if we didn't have those headwinds in China, I think things would be materially stronger."  On this news, the price of Macom common stock declined by more than $3.50 per share on April 26, 2017, also pulling down the stock prices of Macom competitors Oclaro, Inc. ("Oclaro"), Inphi Corporation ("Inphi"), NeoPhotonics Corporation ("NeoPhotonics"), Lumentum Holdings Inc. ("Lumentum") and Acacia; the price of Acacia common stock declined approximately 11% on April 26, 2017 to close at $48.08 per share, on unusually high volume of more than 3.5 million shares traded, or more than three times the average daily trading volume over the preceding ten trading days.

41.     On May 8, 2017, a stock analyst at William Blair cut that firm's estimates on Acacia, citing "first-quarter earnings commentary from a number of optical vendors," including Macom, Oclaro, Inphi, NeoPhotonics and Lumentum, each of which had provided underwhelming projections for the June 2017 quarter, citing "near-term demand slowdown in China and inventory correction issues."  The "weakness in most cases was attributed to Huawei," but "Oclaro noted its

business at ZTE ha[d] been affected as well." The analyst pointed out that "Acacia derived 41% of revenue from China in 2016 and ZTE represented 32% of total revenue." The William Blair report went onto state in pertinent part as follows:

> Amid fears that this inventory correction issue could continue throughout the later part of the second half 2017 and the new Phase 12 and 13 China tenders awards will not affect results meaningfully until the fourth quarter – e.g., Oclaro management noted it has no visibility into the June or September time frame – we are lowering our estimates to derisk the model. In addition, our conversations with ADVA – Acacia's second-largest customer, which accounted for 21% of revenue last quarter – highlight an ongoing inventory correction issue as the company is transitioning customers to new platforms.

42.    On this news, the price of Acacia common stock declined further, closing at $46.85 per share on May 8, 2017.

43.    On May 9, 2017, Acacia issued a press release announcing its 1Q17 financial results for the period ended March 31, 2017, and provided even more dour 2Q17 guidance than the market had expected. Acacia guided 2Q17 earnings per share ("EPS") of $0.22-$0.35 per share on revenues of $85-$95 million, considerably lower than the EPS of $0.74 per share on revenues of $131 million that the market had been led to expect based on Defendants' bullish Class Period statements. Acacia again blamed delays in China's Phase 13 provincial ring optical buildouts and lumpy demand trends among ADVA's Internet Content Provider customers.

44.    In order to prevent a free-fall in the stock price, the release included the following positive statements by the Individual Defendants about the Company's business metrics and financial prospects:

> "We are pleased that our first quarter results came in stronger than we expected at the start of the quarter **driven by demand for our CFP and flex-400G products around the world**," said Raj Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "**During the quarter, we made good progress on ramping production of our CFP2-ACO and CFP2-DCO modules with our contract manufacturers and we continue to see strong customer interest for these products**. **We believe that our continued innovation with products like our CFP2-**

*DCO will further advance our technology leadership position and contribute to our growth in the second half of 2017 and beyond*."

"We believe that our strong balance sheet, which shows a significant cash position and no debt, provides us with the financial flexibility to continue to invest in product development *to further strengthen our competitive position and enable us to bring products to those markets that require a rapid pace of innovation, like the DCI market*," said John Gavin, Chief Financial Officer of Acacia Communications. "For example, we recently announced our next generation Pico DSP ASIC which, when combined with our ball grid array PIC, will support transmission speeds of up to 1.2 Tbps with two carriers of 600 Gbps each.  Pico will power our AC1200 module and is focused on DCI applications."

45.    On this news, the price of Acacia common stock declined more than 8% on May 10, 2017, closing at $44.48 per share, on unusually high volume of more than 2 million shares traded.

46.    The statements referenced above in ¶¶17-18, 24, 26-31, 35-36, 38 and 44 were materially false and misleading when made, as they failed to disclose the following adverse facts which were known by Defendants or were recklessly disregarded by them:

(a)    Acacia's top two customers, who were collectively responsible for 62% of its sales, had experienced operational and sales problems in the period ended September 30, 2016, well before Acacia's SPO, which problems were limiting their demand for Acacia products at the time of the SPO;

(b)    a significant portion of the Company's pre-SPO sales growth was attributable to the 4G infrastructure buildout in China that was virtually complete, which was already reducing demand for product in that important market;

(c)    one of the Company's largest customers in Germany was having difficulty rolling out its own cloud-based technology using Acacia's products, reducing that customer's demand for Acacia's products;

(d)    due to a circuit board cleaning process Acacia had since abandoned, there were "quality issue[s]" "affect[ing] a portion of the approximate 1,300 AC400 units and 5,000 CFP units manufactured by one of its three contract manufacturers"; and

(e)    as a result, Defendants' positive statements about Acacia's business, its operations and its prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

47.    On May 31, 2017, Acacia disclosed that it had identified a quality issue with certain of its previously shipped AC400 and CFP units and that it was working with its customers to remediate the problems with those units, to determine the costs of that remediation and to evaluate the impact on Acacia's ongoing manufacturing capacity.

48.    Finally, on July 14, 2017, before the markets opened, Acacia issued a press release announcing its preliminary 2Q17 financial results for the period ended June 30, 2017 and slashing its 3Q17 guidance for the period ending September 30, 2017, with defendant Shanmugaraj stating in pertinent part: "'Our second quarter results were adversely affected by the quality issue identified at one of our three contract manufacturers that we announced on May 31.'"  Shanmugaraj further stated, in pertinent part, that, "'[a]s . . . previously announced, [Acacia had] identified a circuit board cleaning process [that was] the likely root cause of the quality issue,'" that "'[a]lthough [Acacia] began to ramp manufacturing capacity with [its] contract manufacturers during the quarter, [it] experienced supply constraints as capacity was used to both build replacement units and to meet new demand from customers for [its] AC400 and CFP units,'" and that it "'anticipate[d] completing . . . remediation efforts with respect to the remaining impacted units during the third quarter of 2017.'" As a result of this quality issue, Acacia reported 2Q17 EPS of $0.17-$0.20 on revenues of $77-$79 million, far lower than the EPS of $0.31 on $91 million in revenues the market had been led to

expect.  For 3Q17, Acacia said it now anticipated reporting EPS of $0.25 to $0.40 on revenues of $95-$110 million, well below the EPS of $0.47 per share on $108 million in revenues the market had been led to expect.

49.     On this news, the price of Acacia common stock declined from its close of $41.62 per share on July 13, 2017 to close at $39 per share on July 14, 2017, on unusually high volume of more than 3.5 million shares traded.

## ADDITIONAL SCIENTER ALLEGATIONS

50.     As alleged herein, Acacia and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Acacia, their control over, and/or receipt and/or modification of Acacia's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Acacia, participated in the fraudulent scheme alleged herein.

51.     Defendants were further motivated to misrepresent the Company's business metrics and financial prospects in order to profit from selling Acacia common stock.  Indeed, during the Class Period, Acacia senior executives and directors, including both of the Individual Defendants, sold almost 2.9 million of their personally held Acacia shares, reaping more than $188.2 million in proceeds, as follows:

| NAME | DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|
| **PETER Y. CHUNG** | 10/13/16 | 346,202 | $96.50 | $33,408,493 |
| Acacia Director | 03/09/17 | 1,250,000 | $50.25 | $62,812,500 |
| | | 1,596,202 | | $96,220,993 |
| | | | | |
| **DEFENDANT GAVIN** | 10/13/16 | 25,501 | $96.50 | $2,460,847 |
| Acacia CFO | 02/14/17 | 678 | $62.24 | $42,199 |
| | 04/17/17 | 17,416 | $54.51 | $949,346 |
| | 04/17/17 | 401 | $55.08 | $22,087 |
| | 05/15/17 | 4,634 | $48.54 | $224,934 |
| | | 48,630 | | $3,699,413 |
| | | | | |
| **MEHRDAD GIVEHCHI** | 10/13/16 | 98,846 | $96.50 | $9,538,639 |
| Acacia Co-Founder and | 01/05/17 | 26,500 | $60.96 | $1,615,440 |
| VP of Hardware and | 01/05/17 | 8,600 | $61.96 | $532,856 |
| Software | 01/05/17 | 35,598 | $60.95 | $2,169,698 |
| | 01/05/17 | 500 | $63.14 | $31,570 |
| | 01/05/17 | 6,400 | $61.90 | $396,160 |
| | 02/01/17 | 1,200 | $58.42 | $70,104 |
| | 02/01/17 | 800 | $58.81 | $47,048 |
| | 02/01/17 | 2,600 | $55.92 | $145,392 |
| | 02/01/17 | 8,330 | $55.01 | $458,233 |
| | 02/01/17 | 1,800 | $55.87 | $100,566 |
| | 02/01/17 | 1,500 | $58.17 | $87,255 |
| | 02/01/17 | 1,500 | $56.97 | $85,455 |
| | 02/01/17 | 100 | $59.61 | $5,961 |
| | 02/01/17 | 6,400 | $54.95 | $351,680 |
| | 02/01/17 | 1,600 | $57.19 | $91,504 |
| | 02/14/17 | 2,039 | $62.24 | $126,907 |
| | 03/01/17 | 11,530 | $52.21 | $601,981 |
| | 03/01/17 | 300 | $52.70 | $15,810 |
| | 03/01/17 | 2,900 | $51.10 | $148,190 |
| | 03/01/17 | 8,900 | $52.23 | $464,847 |
| | 03/01/17 | 2,200 | $51.14 | $112,508 |
| | 04/03/17 | 800 | $60.34 | $48,272 |
| | 04/03/17 | 3,660 | $58.40 | $213,744 |
| | 04/03/17 | 4,969 | $58.44 | $290,388 |
| | 04/03/17 | 6,740 | $59.39 | $400,289 |
| | 04/03/17 | 8,961 | $59.38 | $532,104 |
| | 04/03/17 | 700 | $60.11 | $42,077 |
| | 05/01/17 | 9,949 | $46.36 | $461,236 |
| | 05/01/17 | 4,781 | $46.91 | $224,277 |
| | 05/01/17 | 8,325 | $46.40 | $386,280 |

- 18 -

|  |  |  |  |  |
|---|---|---|---|---|
|  | 05/01/17 | 2,775 | $46.96 | $130,314 |
|  | 05/15/17 | 7,390 | $48.51 | $358,489 |
|  |  | 289,193 |  | $20,285,274 |
|  |  |  |  |  |
| **BENNY P. MIKKELSEN** | 10/13/16 | 98,846 | $96.50 | $9,538,639 |
| Acacia Chief Technology | 01/05/17 | 400 | $62.75 | $25,100 |
| Officer | 01/05/17 | 300 | $63.50 | $19,050 |
|  | 01/05/17 | 14,162 | $61.97 | $877,619 |
|  | 01/05/17 | 62,664 | $60.94 | $3,818,744 |
|  | 02/01/17 | 1,600 | $58.65 | $93,840 |
|  | 02/01/17 | 14,642 | $54.98 | $805,017 |
|  | 02/01/17 | 4,500 | $55.92 | $251,640 |
|  | 02/01/17 | 1,900 | $56.88 | $108,072 |
|  | 02/01/17 | 200 | $59.61 | $11,922 |
|  | 02/01/17 | 3,000 | $57.97 | $173,910 |
|  | 02/14/17 | 2,032 | $62.24 | $126,472 |
|  | 03/01/17 | 21,149 | $51.11 | $1,080,925 |
|  | 03/01/17 | 4,693 | $52.08 | $244,411 |
|  | 04/03/17 | 8,105 | $58.46 | $473,818 |
|  | 04/03/17 | 16,537 | $59.40 | $982,298 |
|  | 04/03/17 | 1,200 | $60.50 | $72,600 |
|  | 05/01/17 | 7,068 | $46.95 | $331,843 |
|  | 05/01/17 | 18,774 | $46.38 | $870,738 |
|  | 05/15/17 | 7,475 | $48.52 | $362,687 |
|  |  | 289,247 |  | $20,269,346 |
|  |  |  |  |  |
| **FRANCIS J. MURPHY** | 11/15/16 | 1,582 | $69.19 | $109,459 |
| Acacia Corporate Controller | 12/15/16 | 3,785 | $66.79 | $252,800 |
|  | 01/03/17 | 6,752 | $62.15 | $419,637 |
|  | 01/09/17 | 17,157 | $60.43 | $1,036,798 |
|  | 01/30/17 | 1,608 | $60.67 | $97,557 |
|  | 03/31/17 | 1,668 | $60.67 | $101,198 |
|  | 04/03/17 | 1,201 | $59.46 | $71,411 |
|  | 04/24/17 | 400 | $52.91 | $21,164 |
|  | 07/03/17 | 305 | $41.53 | $12,667 |
|  |  | 34,458 |  | $2,122,690 |
|  |  |  |  |  |
| **CHRISTIAN J. RASMUSSEN** | 10/13/16 | 98,846 | $96.50 | $9,538,639 |
| Acacia Co-Founder and | 01/05/17 | 400 | $62.78 | $25,112 |
| VP of Digital Signal | 01/05/17 | 14,898 | $61.94 | $922,782 |
| Processing & Optics | 01/05/17 | 300 | $63.50 | $19,050 |
|  | 01/05/17 | 61,928 | $60.95 | $3,774,512 |
|  | 02/01/17 | 800 | $58.66 | $46,928 |

|  |  |  |  |  |
|---|---|---|---|---|
|  | 02/01/17 | 3,200 | $58.21 | $186,272 |
|  | 02/01/17 | 14,992 | $54.99 | $824,410 |
|  | 02/01/17 | 2,300 | $57.03 | $131,169 |
|  | 02/01/17 | 4,350 | $56.01 | $243,644 |
|  | 02/01/17 | 200 | $59.61 | $11,922 |
|  | 02/14/17 | 3,321 | $62.24 | $206,699 |
|  | 03/01/17 | 20,882 | $51.12 | $1,067,488 |
|  | 03/01/17 | 4,960 | $52.10 | $258,416 |
|  | 04/03/17 | 1,600 | $60.43 | $96,688 |
|  | 04/03/17 | 7,625 | $58.47 | $445,834 |
|  | 04/03/17 | 16,617 | $59.37 | $986,551 |
|  | 05/01/17 | 9,238 | $46.91 | $433,355 |
|  | 05/01/17 | 16,604 | $46.35 | $769,595 |
|  | 05/15/17 | 10,060 | $48.52 | $488,111 |
|  |  | 293,121 |  | $20,477,176 |
|  |  |  |  |  |
| **JOHN RITCHIE** | 10/13/16 | 2,640 | $96.50 | $254,760 |
| Acacia Director | 05/09/17 | 2,640 | $47.20 | $124,608 |
|  |  | 5,280 |  | $379,368 |
|  |  |  |  |  |
| **BHUPENDRA C. SHAH** | 10/13/16 | 47,917 | $96.50 | $4,623,991 |
| Acacia VP Engineering | 01/05/17 | 23,800 | $60.96 | $1,450,848 |
|  | 01/05/17 | 500 | $63.14 | $31,570 |
|  | 01/05/17 | 1,500 | $62.06 | $93,090 |
|  | 01/05/17 | 5,100 | $61.93 | $315,843 |
|  | 01/05/17 | 8,280 | $60.96 | $504,749 |
|  | 02/01/17 | 800 | $57.47 | $45,976 |
|  | 02/01/17 | 300 | $57.19 | $17,157 |
|  | 02/01/17 | 5,800 | $55.02 | $319,116 |
|  | 02/01/17 | 1,960 | $55.03 | $107,859 |
|  | 02/01/17 | 500 | $56.11 | $28,055 |
|  | 02/01/17 | 100 | $59.61 | $5,961 |
|  | 02/01/17 | 1,900 | $56.16 | $106,704 |
|  | 02/01/17 | 500 | $58.31 | $29,155 |
|  | 02/01/17 | 1,200 | $58.52 | $70,224 |
|  | 02/14/17 | 909 | $62.24 | $56,576 |
|  | 03/01/17 | 7,600 | $52.23 | $396,948 |
|  | 03/01/17 | 2,658 | $52.24 | $138,854 |
|  | 03/01/17 | 200 | $52.81 | $10,562 |
|  | 03/01/17 | 602 | $51.11 | $30,768 |
|  | 03/01/17 | 2,000 | $51.20 | $102,400 |
|  | 04/03/17 | 1,363 | $58.52 | $79,763 |
|  | 04/03/17 | 400 | $60.52 | $24,208 |

|  |  |  |  |  |
|---|---|---|---|---|
|  | 04/03/17 | 3,800 | $58.51 | $222,338 |
|  | 04/03/17 | 5,600 | $59.43 | $332,808 |
|  | 04/03/17 | 1,797 | $59.45 | $106,832 |
|  | 04/03/17 | 100 | $60.51 | $6,051 |
|  | 05/15/17 | 5,112 | $48.53 | $248,085 |
|  |  | 132,298 |  | $9,506,490 |
|  |  |  |  |  |
| **DEFENDANT SHANMUGARAJ** | 10/13/16 | 93,500 | $96.50 | $9,022,750 |
| Acacia CEO | 10/13/16 | 14,663 | $96.50 | $1,414,980 |
|  | 01/05/17 | 2,688 | $60.93 | $163,780 |
|  | 01/05/17 | 21 | $62.72 | $1,317 |
|  | 01/05/17 | 491 | $61.93 | $30,408 |
|  | 01/05/17 | 7,224 | $60.93 | $440,158 |
|  | 01/05/17 | 2,688 | $60.93 | $163,780 |
|  | 01/05/17 | 491 | $61.93 | $30,408 |
|  | 01/05/17 | 21 | $62.72 | $1,317 |
|  | 01/05/17 | 1,318 | $61.93 | $81,624 |
|  | 01/05/17 | 58 | $62.72 | $3,638 |
|  | 01/06/17 | 2,924 | $61.28 | $179,183 |
|  | 01/06/17 | 1,088 | $61.28 | $66,673 |
|  | 01/06/17 | 1,088 | $61.28 | $66,673 |
|  | 01/06/17 | 5,676 | $60.70 | $344,533 |
|  | 01/06/17 | 2,112 | $60.70 | $128,198 |
|  | 01/06/17 | 2,112 | $60.70 | $128,198 |
|  | 02/02/17 | 1,811 | $57.82 | $104,712 |
|  | 02/02/17 | 1,283 | $57.08 | $73,234 |
|  | 02/02/17 | 1,811 | $57.82 | $104,712 |
|  | 02/02/17 | 288 | $58.52 | $16,854 |
|  | 02/02/17 | 3,446 | $57.08 | $196,698 |
|  | 02/02/17 | 4,866 | $57.82 | $281,352 |
|  | 02/02/17 | 106 | $58.52 | $6,203 |
|  | 02/02/17 | 106 | $58.52 | $6,203 |
|  | 02/02/17 | 1,283 | $57.08 | $73,234 |
|  | 02/03/17 | 1,591 | $56.28 | $89,541 |
|  | 02/03/17 | 2,082 | $57.08 | $118,841 |
|  | 02/03/17 | 809 | $57.08 | $46,178 |
|  | 02/03/17 | 809 | $57.08 | $46,178 |
|  | 02/03/17 | 4,118 | $56.28 | $231,761 |
|  | 02/03/17 | 1,591 | $56.28 | $89,541 |
|  | 02/14/17 | 2,029 | $62.24 | $126,285 |
|  | 03/01/17 | 286 | $50.97 | $14,577 |
|  | 03/01/17 | 3,714 | $52.30 | $194,242 |
|  | 03/01/17 | 1,393 | $52.30 | $72,854 |

| | | | |
|---|---:|---:|---:|
| | 03/01/17 | 107 | $50.97 | $5,454 |
| | 03/01/17 | 1,393 | $52.30 | $72,854 |
| | 03/01/17 | 107 | $50.97 | $5,454 |
| | 03/02/17 | 1,500 | $51.21 | $76,815 |
| | 03/02/17 | 1,500 | $51.21 | $76,815 |
| | 03/02/17 | 4,000 | $51.21 | $204,840 |
| | 05/15/17 | 8,983 | $48.52 | $435,855 |
| | | 189,175 | | $15,038,903 |
| **ERIC A. SWANSON**<br>Acacia Director | 10/13/16 | 2,640 | $96.50 | $254,760 |
| | | *2,880,244* | | *$188,254,413* |

## LOSS CAUSATION/ECONOMIC LOSS

52.  During the Class Period, as detailed herein, the Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Acacia securities and operated as a fraud or deceit on Class Period purchasers of Acacia securities by misrepresenting the Company's business and prospects. Later, when the Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the prices of Acacia securities fell precipitously, as the prior artificial inflation came out of the prices over time. As a result of their purchases of Acacia securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

53.  Acacia's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

54.  The Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Acacia who knew that the FLS was false.

None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased Acacia publicly traded securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

56.    The members of the Class are so numerous that joinder of all members is impracticable. Acacia securities were actively traded. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Acacia or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

59.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the 1934 Act was violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and prospects of Acacia; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

60.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

61.    Plaintiff incorporates ¶¶1-60 by reference.

62.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were misleading, or deliberately disregarded that they were misleading, in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Acacia securities during the Class Period.

64.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Acacia securities.  Plaintiff and the Class would not have purchased Acacia securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Violations of §20(a) of the 1934 Act
### Against All Defendants

65.     Plaintiff incorporates ¶¶1-64 by reference.

66.     The Individual Defendants acted as controlling persons of Acacia within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Acacia stock, the Individual Defendants had the power and authority to cause Acacia to engage in the wrongful conduct complained of herein.  Acacia controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead

Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil

Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

D.      Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  September 7, 2017              LAW OFFICE OF ALAN L. KOVACS
                                      ALAN L. KOVACS (BBO #278240)


                                           /s/ Alan L. Kovacs
                                      ALAN L. KOVACS

                                      257 Dedham Street
                                      Newton, MA  02461
                                      Telephone:  617/964-1177
                                      617/332-1223 (fax)

                                      ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                      SAMUEL H. RUDMAN
                                      MARY K. BLASY
                                      58 South Service Road, Suite 200
                                      Melville, NY  11747
                                      Telephone:  631/367-7100
                                      631/367-1173 (fax)

- 26 -

JOHNSON FISTEL, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone:  770/200-3104
770/200-3101 (fax)

*Attorneys for Plaintiff*

I:\Admin\CptDraft\Securities\CPT Acacia Comms.docx